# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | |
| ) | |
| ) | |
| UNITED STATES OF AMERICA ) | Case No. 23-cr-10186-ADB |
| ) | |
| v. ) | |
| ) | |
| DEVONNE MCDONALD-JONES, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## DEFENDANT DE'VONNE MCDONALD-JONES
## SENTENCING MEMORANDUM

De'Vonne McDonald Jones acknowledges that he was a member of the Heath Street gang. And he admits to committing crimes as part of the gang's operation, including drug dealing and fraud. He also understands and accepts that, because of his actions, this Court will sentence him to spend a period of years in a federal prison. Indeed, he acknowledges such a sentence is warranted—because while Mr. McDonald-Jones has left gang life behind him, he knows full well the negative impact that Health Street and its ilk have had on their communities in Boston. Indeed, Mr. McDonald-Jones experienced that impact himself, having been groomed to join Heath Street when he was just a teen and then enduring all that gang life threw his way—including seeing multiple friends shot and killed before his eyes.

Now in his late twenties, Mr. McDonald-Jones understands that the "street life" he once led offers none of what he wants for himself, his children, or anyone else. He is done with it and has been for some time. At the time of his arrest, he was working fulltime, trying to earn money to support his children and build a life of meaning and purpose. That remains his goal, and Mr.

McDonald-Jones plans to spend his time in prison working to prepare himself to emerge a better father and a better person.

The question is what sentence is appropriate today to account for the seriousness of the crimes Mr. McDonald-Jones committed as a teenager and young adult, as well as myriad militating factors—including difficult life circumstances that contributed to Mr. McDonald-Jones's criminal history, as well as efforts he has made to improve his life and be a reliable father and role model to his son and daughter.

Ultimately, for reasons detailed herein, we respectfully submit that a sentence of 48 months, followed by three years of supervised release, would be sufficient—but not greater than necessary—to achieve the purposes of sentencing.

## MR. MCDONALD-JONES'S BACKGROUND

Mr. McDonald-Jones was born in Boston to unwed parents.  (PSR ¶ 105.)  Through his childhood, Mr. McDonald-Jones lived with various relatives in various places—sometimes with his mother in Roxbury or Mattapan; sometimes with his mother and father in Roxbury; and sometimes with his grandmother and other paternal relatives in the Bromley Heath Housing Development (renamed "Mildred Hailey Housing Development" in 2016), located in Jamaica Plain.  (PSR ¶¶ 105–107.)  As the Court knows, that housing project is the heart of Heath Street turf.

While Mr. McDonald-Jones loves and appreciates his parents and the extended family members who helped raise him (*id.*), the fact is he did not grow up in a safe or secure environment. His father was in and out of prison, serving several multiyear terms of imprisonment for both state (2008—2011) and federal crimes (1998–2002; 2020–2025), leaving Mr. McDonald-Jones without a consistent, positive, male role model.  (PSR ¶ 105.)  Growing up, Mr. McDonald-Jones also bore

witness to a great deal of violence and criminal activity—*e.g.*, three of his close friends were murdered in street shootings, and Mr. McDonald-Jones was present for two of them. (PSR ¶ 107.) Given such unstable conditions, it is no surprise that Mr. McDonald-Jones exhibited behavioral issues in school, despite being "very capable academically." (PSR ¶ 129.) His misbehavior also resulted in a number of juvenile arrests. (*See, e.g.*, PSR ¶¶ 87–90, ¶¶ 98–100.)

Despite those challenges, Mr. McDonald-Jones found a semblance of structure and support through organized athletics—including basketball and football. (PSR ¶ 119.) To this day, Mr. McDonald-Jones's high school football recruiting profile from 2015 is still available online.[1] That profile includes pictures of Mr. McDonald-Jones in action—*e.g.*,



—and even includes a highlight video from his performance against Dorchester High.[2] These team sports, and the positive structure they provided, brought out the best in Mr. McDonald-Jones. As one of his former basketball coaches, Oscar Lopez, "vividly remember[s]," Mr. McDonald-Jones was "the kind of teammate everyone could rely on," the person who "would rally the group—encouraging them to push through the running, stay positive, and keep working together."

---

[1]     *See Devonne McDonald-Jones Profile*, HUDLE.COM, available at https://www.hudl.com/profile/6458158/Devonne-McDonaldJones (last visited Nov. 25, 2025).

[2]     *See Devonne McDonald-Jones Profile Highlights*, HUDLE.COM, available at https://www.hudl.com/video/3/6458158/5721cb9c9a91677e749c697c (last visited Nov. 25, 2025).

(Ex. A-1 at 1.)  As Mr. Lopez observed, "leadership and care for others" have always been part of who Mr. McDonald-Jones is.  (*Id.*)  Mr. McDonald-Jones' mother, Simone McDonald, also points out that leadership and care for others is at the core of his character, noting how he he "has always been loving and compassionate to his two [younger] siblings," and "has always been a very supportive son during [her own] dark times of depression."  (Ex. A-3.)

Unfortunately, the call of the street ultimately prevailed over the cheers of the athletic arena.  Mr. McDonald-Jones was arrested during the fall of his senior year of high school and incarcerated (PSR ¶ 91), resulting in his withdrawal from school, the end of his athletic career, and the beginning of a cycle of arrests and incarceration that comprised his young adulthood.

Without the structure of school and athletics, Mr. McDonald-Jones also fell into substance abuse.  For years, Mr. McDonald-Jones has had issues abusing both alcohol and opiates.  (PSR ¶¶ 123–124.)  Indeed, a failed drug test cost Mr. McDonald-Jones a job with the carpenters union (PSR ¶ 127), a solid position where he had been "described as a hard worked and crew member." (PSR ¶ 133.)

Yet despite his lack of familial stability, criminal environment, and substance abuse issues, Mr. McDonald-Jones has tried to better his life and change its arc.  For example, while incarcerated as a teenager, Mr. McDonald-Jones applied himself and earned his GED.  (PSR ¶ 129.)  And from 2019 to 2021, he worked with the Local 327 Carpenters Union, earning certifications in aerial lift operation, construction fall protection, ergonomics, scaffold use, and OSHA10.  Unfortunately, a failed drug test—caused by his opiate dependence—cost him that job.  (PSR ¶ 127.)  Despite that setback, Mr. McDonald-Jones pushed himself to find new employment, and from 2021 until his arrest in 2024, he worked a physically demanding job as a truck helper and warehouse worker at J.B. Hunt.  (PSR ¶ 132.)

Over the last four or so years, Mr. McDonald-Jones made real strides putting street life behind him. As the father of two young children—a seven year old son, Jaiden; and a two year old daughter, Summer—Mr. McDonald-Jones embraced his role as a provider. (PSR ¶ 117–119). Tadaja Allen—Mr. McDonald-Jones's longtime girlfriend and mother of his young daughter—describes him as a "very attentive, kind, loving, patient and reliable" partner. (Ex. A-2 at 1.) She notes how, over the last few years, she's seen "a drastic change in De'Vonne's mentality," with "his main focus [being] to build health relationships within [their] blended family"—including not only Ms. Allen and Summer, but also Mr. McDonald-Jones's ex-girlfriend, Brianna Wiggins, and their son Jaiden. (*Id.*) Ms. Allen "never had a relationship with [her] biological father," and so is keenly aware of how important Mr. McDonald-Jones's presence is and has been to his children's development. Mr. McDonald-Jones's mother has also seen how fatherhood changed him for the better; as she puts it, "I seen my son grow to a mature young man once he became a dad to his two loving children." (Ex. A-3.)

## **PROCEDURAL HISTORY**

Mr. McDonald-Jones was charged in February 2024 with conspiracy to conduct enterprise affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). *See* Superseding Indictment, ECF No. 57 (Count Five). On February 7, 2024, Mr. McDonald-Jones was at work at a J.B. Hunt warehouse when he was arrested on that charge—and he has since been in federal custody at Plymouth County Correctional Facility. (*See* PSR ¶ 6.)

Mr. McDonald-Jones pled guilty to that charge on July 22, 2025, pursuant to a plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, which includes an agreed-upon sentence of incarceration between 48 and 138 months. *See* Plea Agreement, ECF No.

366. That agreement specifically reserves Mr. McDonald-Jones's right to challenge the Government's proposed guideline calculations. *See* Plea Agreement, ECF No. 366.

His sentencing is scheduled for December 3, 2025.

## THE SENTENCING GUIDELINES

According to Probation, Mr. McDonald-Jones has a guidelines range of 135–168 months, based on a Criminal History Category of IV and a Total Adjusted Offense Level of 30. That would put a sentence of 138 months—the top-end of the plea agreement's agreed-upon range—at the low-end of the applicable guidelines range. But, as explained below, that Total Adjusted Offense Level is wrong because it is based on a foundational error—*i.e.*, that Mr. McDonald-Jones conspired to commit murder on or about April 23, 2020. Plea Agreement ¶ 4; PSR ¶¶ 58–65.

When appropriately calculated, Mr. McDonald-Jones's guidelines range is just 33–41 months, based on a Criminal History Category of IV and a Total Adjusted Offense Level of 16.[3] That puts a sentence of 48 months—the low-end of the agreed-upon range—slightly *above* the top-end of the applicable guidelines range.

## I.    Offense Level Dispute

### A.  Mr. McDonald-Jones's Correct Total Offense Level Is 16

Mr. McDonald-Jones admits that he committed two crimes in furtherance of the charged RICO scheme: (1) one act of possession with intent to distribute a controlled substance on or about

---

[3]    On November 12 and November 17, 2025, Mr. McDonald-Jones advised Probation of a variety of objections to the PSR. But as of time this Sentencing Memorandum was finalized, Mr. McDonald-Jones and his counsel had yet not received a final copy of the final PSR, and so did not know Probation's responses to all those objections. Accordingly, Mr. McDonald-Jones respectfully reiterates and preserves all of his objections to the PSR and will be prepared to address them at sentencing, as the Court deems necessary and appropriate. Further, all of Mr. McDonald-Jones citations herein to particular paragraphs in the PSR are based on paragraph numbers in the draft PSR previously received—which Probation advised will be unchanged in the final PSR.

October 8, 2019; and (2) one act of wire fraud on or about April 6, 2021.  (PSR ¶ 3.)   Using those appropriate predicates, Mr. McDonald-Jones's total offense level is 16, as explained below.

We begin with his conviction for possessing cocaine base with intent to distribute.  Because Mr. McDonald-Jones possessed approximately 15 grams of that substance, his base offense level is 18.  *See* USSG §2D1.1(a)(c)(11) ("At least 11.2 G but less than 16.8 G of Cocaine Base").  (*See also* PSR ¶ 66.)  No other adjustments apply, and so 18 is also the adjusted offense level for this drug crime.  (PSR ¶ 71.)

We then turn to wire fraud, related to the Paycheck Protection Program.  There, his base offense level is 7, given that the offense at issue has a statutory maximum of 20 years or more.  *See* USSG § 2B1.1(a)(1).  (*See also* PSR ¶ 72.)  Based on a loss of approximately $17,750, there is 4-level bump in offense level.  *See* USSG §2B1.1(b)(1)(C).  (*See also* PSR ¶ 73.)  As there are no other adjustments, the adjusted offense level for this fraud crime is 11.  (PSR ¶ 77.)

Next, we make an adjustment for multiple counts (*see* USSG §3D1.4):

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| PWID Cocaine Base | 18 | 1 |
| Wire Fraud | 11 | .5 |
| | *TOTAL UNITS* | *1.5* |

Because the Total Units are 1.5, there is a 1-level bump in offense level to 19.

Finally, there is a 3-level decrease for acceptance of responsibility, resulting in a total offense level of 16.

### B.  The Government Has Not Established—And Cannot Establish—That Mr. McDonald-Jones Participated in Any Conspiracy To Commit Murder

The Government and Probation contend that the Total Offense Level is 30 based on an erroneous contention that Mr. McDonald-Jones should be held responsible for an Attempted

Murder Conspiracy that allegedly occurred on April 23, 2020. (PSR ¶ 85.)[4] But the Government cannot establish by a preponderance of the evidence that Mr. McDonald-Jones is responsible for any such crime, and so the Court should reject this argument and strike the entire discussion of this event from his PSR. *See United States v. Sandoval*, 6 F.4th 63, 104 (1st Cir. 2021) ("The District Court must find [RICO-related] relevant conduct by a preponderance of the evidence.").

To establish Mr. McDonald-Jones's participation in this alleged conspiracy under Massachusetts law, the Government must prove that he "combined with another 'with the intention'" to "commit the object crime"—i.e., murder. *Com. v. Frazier*, 410 Mass. 235, 245 (1991) (citation omitted). And to establish murder under Massachusetts law, the Government must prove that Mr. McDonald-jones acted with "deliberate premeditation," meaning a specific intent "that his actions will cause death." *Com. v. Judge*, 420 Mass 433, 441 (1995). The federal standard is similar, defining murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. The Government has not—and cannot—meet its evidentiary burden here.

The Government has not proffered (let alone presented) any evidence to prove that Mr. McDonald-Jones was involved in planning or facilitating any crime on April 23,2020—let alone murder. There is no evidence he communicated with anyone, ever, in advance of this shooting in order to arrange it. Nor is there evidence he ever communicated with anyone, ever, after this

---

[4] Mr. McDonald-Jones's objections to the PSR include objections to the "Offense Conduct," found in PSR ¶¶ 11–52. This sentencing memorandum focuses on the dispute regarding the April 23, 2020 shooting, as that is the offense the Government seeks to pin on Mr. McDonald-Jones for purposes of sentencing. But, as noted in his objections to the PSR, Mr. McDonald-Jones opposes *any* inclusion of facts in his "Offense Conduct" related to two other violent crimes, *both of which the Government admits it cannot prove*—i.e., a June 6, 2018 Bank Robbery; and a June 7, 2021 murder. As to both these offenses, the Government has stated plainly—and the PSR has repeated—that "[t]he government does not believe it could prove for Guideline purposes that McDonald-Jones was involved in this crime." Accordingly, all "facts" about these alleged crimes should be excised from the PSR.

shooting to discuss how it went.  For example, no text messages suggest Mr. McDonald-Jones was involved in planning a crime on April 23, 2020—despite the Government's seizure of a host of phones in this sprawling  investigation, many of which contain incriminatory messages to and from various parties.  And no recorded phone calls suggest he was involved, either—despite the hours of recordings produced in discovery, many of which include incriminating statements by various parties about various events.  Nor has any cooperating witness indicated that Mr. McDonald-Jones was involved in arranging a crime on April 23, 2020, or any other date—despite the Government's representations that it has multiple Heath Street members signed-up to cooperate.  Nor has the Government proffered (let alone presented) any evidence to show that Mr. McDonald-Jones drove anyone to or from the scene of this crime—no GPS data places him at the scene; no cooperator testimony suggests he had a role as a driver; no video evidence shows him or his vehicle at the shooting.

This gap in the Government's evidence is a mile wide.  In an attempt to bridge it, the Government—and now Probation in the PSR—quotes a recorded jail call in which someone *else* (Deondre Blanding) discusses *his* involvement (not Mr. McDonald-Jones's) in a *different* offense. (PSR ¶ 46.)  But that call does nothing to establish that Mr. McDonald-Jones planned or participated in any shooting, let alone one on April 23, 2020—as that event is not even the topic of the quoted conversation.  In short, the Government's evidentiary bridge goes nowhere.

At bottom, the only so-called evidence proffered by the Government are two video recordings, which it claims depict Mr. McDonald-Jones's black, 2017 Honda Accord "at approximately 2:43 a.m., seven minutes before the shooting heading towards the area of the shooting" and then again "[a]t approximately 2:51:42 a.m., . . . speeding away from the area where" the shooting had occurred.  (PSR ¶ 44.)  But that is demonstrably false.

First off, below are images from those two videos, and it is clear they *do not depict the same car*:

**2:43 AM still image:**



**2:51 AM still image:**



As seen above, the **2:43 AM** car has banner tail lights that span the car's rear, over and above the license plate; whereas the **2:51 AM** car has two separate tail lights, on either side of the license plate. A close-up view makes the distinction even clearer:

**2:43 AM still image close-up:**



**2:51 AM still image close-up:**



Simply put, these videos/images do not depict the same vehicle.

Furthermore, no evidence establishes that *either* of these cars is Mr. McDonald-Jones's black, 2017 Honda Accord. Neither has a legible license plate. Neither can even be confirmed as black in color—*e.g.*, either could be navy blue. And neither can even be identified as by make/model as a Honda Accord. Indeed, the tail lights of the **2:51 AM** car—the one allegedly speeding away from the shooting—look like those of a Honda ***Civic***, not an Accord. That is evident

in the **2:51 AM** car lights' triangular/arrowhead shape:

**2017 Honda Civic:**



**2017 Honda Accord:**



Nor does temporal proximity between the alleged shooting and Mr. McDonald-Jones' arrival at the hospital prove he was involved in a conspiracy to commit any crime—let alone murder. As shown on the map below, the Mildred Hailey Development is located directly between 60 Holworthy Street (where the shooting allegedly took place), and the Brigham & Women's Emergency Room (where Mr. McDonald-Jones delivered a wounded young man):



And it is undisputed that the Mildred Hailey development is the "home base" of Heath Street — where most of its members live and spend time. Thus, there are wholly innocent explanations for how Mr. McDonald-Jones came to drive the wounded individual to the hospital within 15 or so

minutes of the alleged shooting.   For example, consider this scenario:  The alleged shooters flee the scene and return to their home base, the Mildred Hailey Development; Mr. McDonald-Jones happens to be among those hanging out in the project's parking lot when those young men return; Mr. McDonald-Jones sees that one of young men needs urgent medical care, and so quickly puts the victim into his car and drives him to the hospital.  That is not a crime—let alone a conspiracy to commit murder.

Indeed, Mr. McDonald-Jones acknowledges that sometime after the shooting occurred, he *did* drive a wounded young man to the hospital to receive medical treatment, and he did so in a black, 2017 Honda Accord.  But Mr. McDonald-Jones did not do the sort of "drop and run" that is common in gang-related shootings and might be considered consistent with criminal behavior.[5] Instead, Mr. McDonald-Jones dropped the young man off and stayed on scene—behavior consistent with an innocent state of mind and genuine concern for the victim's well-being.

Such conduct does not constitute attempted murder or conspiracy to commit a crime.  Even if one assumes that Mr. McDonald-Jones (i) learned about the circumstances of the shooting after it occurred (perhaps in speaking to the injured person who he transported to the hospital, or to someone who asked Mr. McDonald-Jones to transport the injured person to the hospital), *and*

---

[5] *See, e.g.*, Erika Wurst, *Man dies in Tucson shooting*, TUCSON.COM (Aug. 23, 2025) (describing how 35-year-old man with a gunshot wound was left at a Tucson hospital, where he died), *available at* https://tucson.com/news/local/crime-courts/article_71ce160a-b3a5-42a9-880d-92e63c4cb641.html   (last visited Nov. 25, 2025); Anonymous, *Shooting victim dropped off at hospital, police investigate possible crime scene*, CBSNEWS (May 26, 2022) (describing how man was dropped off at Pittsburgh hospital with a gunshot wound, and he survived), *available at* https://www.cbsnews.com/pittsburgh/news/shooting-victim-dropped-off-at-hospital-police-investigate-possible-crime-scene/ (last visited Nov. 25, 2025); Briana Smith, *2 nurses injured in hit-and-run outside of Penn Presbyterian Medical Center*, 6ABC.COM (Oct. 12, 2024) (describing how three nurses were injured by a driver who dropped off a shooting victim and then fled the scene), *available at* https://6abc.com/post/nurses-injured-when-driver-flees-penn-presbyterian-medical-center-after-dropping-off-shooting-victim/15420598/ (last visited Nov. 25, 2025).

(ii) was told that the shooting was a premeditated act in furtherance of Heath Street (although there is no proof of that), his conduct still does not even make him an accessory after the fact. That is so because no evidence suggests that Mr. McDonald-Jones intended to hinder anyone's apprehension or prosecution by taking them to the hospital. *See, e.g.*, 18 U.S.C. § 3 (including an element that the defendant act "in order to hinder or prevent [the principal offender's] apprehension, trial or punishment"); M.G.L. ch. 274 § 4 (including an element that the defendant act "with the intent that [the principal felon] shall avoid or escape detention, arrest, trial or punishment").

Accordingly, Mr. McDonald-Jones's offense level should not be tethered to that crime— and any reference to it should be deleted from his PSR. Instead, as explained above, the applicable base offense level should be determined based on his admitted commission of the following crimes: (1) possession with intent to distribute a controlled substance on or about October 8, 2019; and (2) wire fraud on or about April 6, 2021. Thus, his adjusted offense level is 19, which is reduced by 3 levels for acceptance of responsibility, resulting in a total offense level of 16.

## APPLICABLE LAW

This Court is well acquainted with statutory factors it must consider and standards it should apply in exercising its discretion at sentencing. Chief among these is the parsimony principle, which states that sentencing courts should "'impose a sentence sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)). Section 3553(a) also instructs the Court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the U.S. Sentencing Guidelines, the need to avoid unwarranted sentencing disparities,

and the need to provide restitution to victims.  Notably, "a sentencing court may not presume" that a sentence within the applicable guidelines range is reasonable.  *United States v. Smith*, 531 F.3d 109, 111 (1st Cir. 2008).  To the contrary, "a sentencing court is not to presume that the [guideline range] invariably sets the parameters of a reasonable sentence but must make an individualized assessment based on the facts presented."  *United States v. Narvaez-Soto*, 773 F.3d 282, 288 (1st Cir. 2014) (internal quotation marks and citation omitted).

## ARGUMENT

**II.    A Sentence of 48 Months' Is Appropriate Under The 18 U.S.C. 3553(a) Factors**

### A.  A 48-Month Sentence Sufficiently Reflects the Seriousness of the Offense

A sentence of four years—48 months, almost half a decade—is sufficient to reflect the seriousness of the offense.  As a member of Heath Street, Mr. McDonald-Jones committed a drug offense and fraud in furtherance of the gang's activities.  He understands those crimes are serious— indeed, as a drug abuser himself, Mr. McDonald-Jones appreciates the harm that such crimes cause.  And Mr. McDonald-Jones is prepared to face accountability.  But the Government's request for a sentence of ten or more years is far beyond what is reasonable and unsupported by the facts— as no evidence establishes that Mr. McDonald-Jones was involved in Health Street's most serious criminal activity.

While Mr. McDonald-Jones was an admitted member of Heath Street, he was *not* a gang leader or a driver of the gang's destructive violence.  The Government does not, and cannot, allege that Mr. McDonald-Jones was a leading recruiter of young folks to join the gang.  The Government does not, and cannot, allege that Mr. McDonald-Jones was ever a shooter in any assault or murder committed in furtherance of Heath Street.   And while the Government seeks to jack-up the guidelines range via a claim that Mr. McDonald-Jones conspired to commit murder in April 2020, that baseless allegation should be rejected by this Court.  That is so because, as explained above,

the Government's extensive investigation has failed to produce any evidence that Mr. McDonald-Jones knew about the crime in advance, let alone joined in any agreement to plan or facilitate it. Instead, what the Government's evidence shows is that sometime *after* a shootout occurred on April 23, 2020, Mr. McDonald-Jones risked incriminating himself by bringing an injured young man to the hospital, potentially saving that young man's life. Notably, when Mr. McDonald-Jones did so, he did not drop the injured party at the emergency room door and flee the scene—which is what one would expect if, in fact, Mr. McDonald-Jones had been involved in any criminal activity that evening. Instead, he stayed there—a decision reflecting his compassion for the victim, not his complicity in any misconduct.

### B. Mr. McDonald-Jones's Personal Characteristics Support a 48-Month Sentence

Mr. McDonald-Jones's personal history and characteristics also support a 48-month sentence. As discussed above, Mr. McDonald-Jones had a difficult childhood, characterized by instability, trauma, and repeated absences of his incarcerated father. He grew up regularly witnessing violence and criminal activity in the projects where Heath Street has been active since well before he was born. (PSR ¶¶ 12, 107.) Heath Street, as Probation notes, actively recruits juveniles in the community and uses them to commit criminal activity, including drug trafficking and gang violence. (PSR ¶¶ 19, 22.) Mr. McDonald-Jones—a troubled teenager with no consistent, positive male role model—was a prime target for recruitment. It was in this environment that a young Mr. McDonald-Jones, barely a teenager, became enveloped in the Heath Street culture and fell into a cycle of criminal activity. (PSR ¶¶ 87–90.)

This background is not offered as an excuse—Mr. McDonald-Jones deeply regrets *his* criminal acts, understands they are the result of choices *he* made, and he accepts that he must face consequences for *his* crimes. But Mr. McDonald-Jones's upbringing, and the ways in which crime

in his community affected him, provide valuable context for the choices he made—both as a member of Heath Street and, after disassociating from the gang, as a loving father and partner.

In recent years he has dedicated his efforts to caring for his children and improving himself. While he has suffered several setbacks, including from his long-term abuse of alcohol and opiates, Mr. McDonald-Jones has persevered, and he has continued pursuing work and education to provide for both his children and his partner, Ms. Allen. Importantly, Mr. McDonald-Jones has consciously distanced himself from the Heath Street gang and its members in recent years—he has done so out of a genuine desire to turn a new leaf and pursue an honest, upstanding life with his family. He knows firsthand the devastating impact of growing up with an incarcerated father, and he strives to be a positive role model and provider for his children. (*See* PSR ¶ 117.)

### C. A 48-Month Sentence Would Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public from Further Crimes

The age at which Mr. McDonald Jones was active in the Heath Street gang—as an early teen and young adult—and his life since he left the gang, demonstrate that he does not currently pose a significant risk of re-offending.

For starters, *none* of Mr. McDonald-Jones's alleged conduct in furtherance of the RICO scheme is more recent than 2021—four years ago. And *all* of Mr. McDonald-Jones's criminal history points are based on crimes he committed when he was a *teenager*. (PSR ¶¶ 87–92.) That reality underscores that a lenient sentence is appropriate, even if the Court were to conclude that Probation's proposed guidelines range applies. Indeed, research on crime—including violent crime—indicates that people generally "age out" of such activity after their late teens and early

twenties.[6]  Mr. McDonald-Jones is living proof of that data's viability—as discussed, in recent years he distanced himself from Heath Street and focused on earning an honest living and supporting his family.[7]  Indeed, at the time of his arrest he was not on the street corner, he was working in the J.B. Hunt warehouse.

Ultimately, a 48-month sentence would serve the interests of justice, while not being greater than that which is necessary to promote sentencing goals.  Such a sentence will sufficiently punish Mr. McDonald-Jones for his offenses, without forfeiting his entire opportunity to be a supportive father during his children's formative years—and without forfeiting their opportunity to have their father as part of their young lives.  Such a sentence will also provide an opportunity for Mr. McDonald-Jones to benefit from BOP programming—including both substance abuse treatment and vocational programming—which will equip him to be a more productive member of society following his release.  A significantly longer term of imprisonment would not serve those interests.

---

[6]  *See, e.g.*, VERA INST. OF JUST., *A New Paradigm for Sentencing in the United States*, at 26 (Feb. 2023) ("[R]esearch shows that people 'age out' of crime. Violent crime, measured by arrest rates, is much more prevalent among younger people from their late teens to early twenties.  The rate of arrest for such crimes begins to sharply decline after this point and is more than halved by the mid-thirties."), available at https://vera-institute.files.svdcdn.com/production/downloads/publications/Vera-Sentencing-Report-2023.pdf?dm=1676058378 (last visited Nov. 25, 2025).

[7]  *See* RTI International, *Incarceration and the Family: A Review of Research and Promising Approaches for Serving Fathers and Families*, U.S. DEP'T OF HEALTH AND HUM. SERVS. (Aug. 31, 2008) (finding that men "who report positive family and parenting relationships during reentry are less likely to recidivate"), available at https://aspe.hhs.gov/reports/incarceration-family-review-research-promising-approaches-serving-fathers-families-1 (last visited Nov. 25, 2025).

### D.  A Sentence Exceeding 48 Months Would Create Unwarranted Sentencing Disparities Among Similarly Situated Criminal Defendants

The need to avoid unwarranted sentence disparities for similarly situated defendants in other cases further supports a 48-month sentence.  18 U.S.C. § 3553 (a)(6); *see United States v. Reyes-Santiago*, 804 F.3d 453, 467 (1st Cir. 2015) (internal quotations omitted) ("We have observed that this provision is primarily aimed at National disparities, rather than those between co-defendants.").  In this process, a helpful analog are sentences imposed in another RICO prosecution of a Boston street gang—the NOB Street Gang case (*USA v. Teixeira et al.*, 20-cr-10197-LTS (D. Mass)).  Those sentences demonstrate that 48 months is reasonable for Mr. McDonald-Jones, and that a higher sentence would create an unwarranted disparity.

For example, NOB defendant Joseph Gomes admitted that he participated in two armed robberies as RICO predicate acts—and he received a 60-month sentence.  *See* Joseph Gomes Sentencing Mem. at 4, *Teixeira et al.*, 20-cr-10197-LTS (D. Mass. Nov. 30, 2022), ECF No. 614; J. as to Joseph Gomes, *Teixeira et al.*, 20-cr-10197-LTS (D. Mass. Dec. 6, 2022), ECF No. 623. Similarly, NOB defendant David Rodriguez had predicate acts of robbery and possession with intent to distribute narcotics—and he received a 57-month sentence.  *See* David Rodriguez Sentencing Mem. at 9, *Teixeira et al.*, 20-cr-10197-LTS (D. Mass. Nov. 22, 2022), ECF No. 603; J. as to David Rodriguez, *Teixeira et al.*, 20-cr-10197-LTS (D. Mass. Nov. 30, 2022), ECF No. 612.  It would be unjust for Mr. McDonald-Jones to receive a sentence similar to or higher than those of RICO defendants whose predicate acts include violent crimes, when his predicates are both non-violent.

Indeed, even assuming that the Government could prove that Mr. McDonald-Jones conspired to commit murder—which it *cannot*—a sentence anywhere close to the high end of the plea agreement's binding range would *still* be inappropriate.  For example, in the NOB case, the

court sentenced defendant Joshua Teixeira to 84 months in prison, based on an underlying predicate act of attempted murder—a violent act in which Teixeira was a shooter.  Joshua Teixeira Sentencing Hr'g Tr. at 34, *Teixeira et al.*, 20-cr-10197-LTS (D. Mass. Dec. 5, 2022), ECF No. 618.  Thus, even if the Court somehow concluded that Mr. McDonald-Jones had some role in the April 2020 shooting, a sentence anywhere in the vicinity of the 138-month limit set by his plea agreement would promote unwarranted sentencing disparities.

## **CONCLUSION**

Mr. McDonald-Jones recognizes and acknowledges the seriousness of his offenses and is prepared to accept full responsibility.  He also understands the impact his decisions have had on himself, his community, and those he loves—most particularly, his two children.  But Mr. McDonald-Jones is confident that, with the assistance of the BOP during his period of incarceration and then support of Probation during his term of supervised release, he can and will be a productive member of society moving forward, including being a supportive father and role model for his son and daughter.

For all the foregoing reasons, and those to be shared at sentencing, Mr. McDonald-Jones respectfully requests that this Court impose a sentence of 48 months imprisonment to be followed by a three-year period of supervised release.   Further, given his financial situation, Mr. McDonald-Jones requests that the Court decline to impose any fine or restitution.  *See* USSG §5E1.2(e).

(cont'd, signature block)

DATED:          November 26, 2025                    Respectfully submitted,

                                                     DE'VONNE MCDONALD-JONES

                                                     By his attorneys,

                                                     /s/ *Michael T. Packard*
                                                     Michael T. Packard (BBO# 676934)
                                                     Minas T. Rasoulis (BBO# 715634)
                                                     Quinn Emmanuel Urquhart & Sullivan, LLP
                                                     111 Huntington Avenue, Suite 520
                                                     Boston, MA 02199
                                                     (617) 712-7100
                                                     michaelpackard@quinnemanuel.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to all counsel, who are registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ <u>*Michael T. Packard*</u>
Michael T. Packard

Dated:  November 26, 2025